Cristina R. Stella (CA Bar No. 305475)
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931-4091
Phone: (707) 795-2533 ext. 1055
Fax: (707) 795-7280
cstella@aldf.org

Collette L. Adkins (MN Bar No. 035059X)*
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Phone: (651) 955-3821
Fax: (510) 844-7150
cadkins@biologicaldiversity.org

*Attorneys for Plaintiffs*

*Seeking admission *pro hac vice*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY; ANIMAL LEGAL DEFENSE FUND; PROJECT COYOTE/EARTH ISLAND INSTITUTE;**<br><br>Plaintiffs,<br><br>v.<br><br>**USDA APHIS WILDLIFE SERVICES; JANET L. BUCKNALL**, Deputy Administrator, USDA APHIS Wildlife Services;<br><br>Defendants. | Case No. 3:19-cv-05362<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiffs Center for Biological Diversity, Animal Legal Defense Fund, and Project Coyote/Earth Island Institute bring this lawsuit against Defendants U.S. Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS") Wildlife Services and Janet Bucknall, the program's Deputy Administrator (hereinafter collectively "Wildlife

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF        1

1  Services"). Wildlife Services is continuing to kill predators and other wildlife in California's Sacramento District without supplementing its outdated National Environmental Policy Act ("NEPA") analysis for its "Wildlife Damage Management" program. In so doing, Wildlife Services is failing to comply with NEPA, 42 U.S.C. §§ 4321-4347, the Council on Environmental Quality's ("CEQ") implementing regulations, 40 C.F.R. §§ 1500-1508, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2. NEPA requires supplemental analysis when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(c)(1)(ii). More than 20 years have passed since Wildlife Services analyzed the impacts of its "Wildlife Damage Management" program in the Sacramento District in a finalized NEPA document. New information and circumstances relevant to the predator-killing program, such as new scientific publications on the ineffectiveness of predator control, require that Wildlife Services prepare a supplemental NEPA analysis.

3. Through this complaint, Plaintiffs seek a declaration that Wildlife Services' ongoing authorization and implementation of the Wildlife Damage Management program in California's Sacramento District violates federal law and is otherwise arbitrary and capricious. Plaintiffs additionally seek injunctive relief to redress the injuries these violations cause. Should Plaintiffs prevail, they will seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706(2).

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the agency's violations of law occurred and continue to occur in this district, and injury to Plaintiffs and their members occurred and continues to occur in this district. Moreover, Plaintiffs maintain offices in this district.

# INTRADISTRICT ASSIGNMENT

6. Pursuant to Civil Local Rules 3-2(c) and 3-2(d), the appropriate intradistrict assignment of this case is the San Francisco Division or Oakland Division because a substantial part of the agency's violations of law occurred and continue to occur in the counties of Napa and Sonoma, which are within the management area of Wildlife Services' California Sacramento District, where implementation of the Wildlife Damage Management program occurs.

# PARTIES

7. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) organization with approximately 69,500 active members. The Center maintains offices in Oakland, California and elsewhere across the country. The Center works through science, law, and media to protect rare wildlife, including predators targeted by Wildlife Services.

8. Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a non-profit 501(c)(3) organization with more than 200,000 members and supporters. Headquartered in Cotati, California, ALDF works to protect the lives and advance the interests of animals, including wildlife, through the legal system. ALDF and its members derive scientific, recreational, conservational, and aesthetic benefits from Wildlife Services' procedural compliance with NEPA and the existence of the diverse wildlife native to California's Sacramento District.

9. Plaintiff PROJECT COYOTE/EARTH ISLAND INSTITUTE includes Project Coyote, which is a fiscally-sponsored project of the national non-profit organization Earth Island Institute based in Northern California. Project Coyote is a coalition of wildlife scientists, educators, ranchers, and community leaders that promotes compassionate conservation and coexistence between people and wildlife through education, science, and advocacy. Project Coyote is dedicated to changing negative attitudes toward coyotes, wolves, and other native carnivores by replacing ignorance and fear with understanding, respect, and appreciation.

10. Plaintiffs, as well as their members, staff, and supporters, are committed to ensuring that Wildlife Services complies with all applicable federal laws. Wildlife Services' Wildlife Damage Management program, along with its associated 1997 Environmental

Assessment and Finding of No Significant Impact ("1997 EA/FONSI"), adversely impact Plaintiffs' interests in the California wildlife that Wildlife Services could injure or kill—intentionally or unintentionally—including gray wolves, coyotes, black bears, mountain lions, bobcats, foxes, beavers, and others. Plaintiffs also have members who are adversely impacted by the threat that Wildlife Services poses to companion animals in the Sacramento District.

11. Plaintiffs' members, staff, and supporters live and recreate in or near areas within the management area of Wildlife Services' California Sacramento District, where implementation of the Wildlife Damage Management program occurs, for the purposes of hiking, observing wildlife, and other recreational and professional pursuits. Plaintiffs' members and staff enjoy observing, attempting to observe, photographing, and studying wildlife, including signs of the above-mentioned species' presence in these areas. The opportunity to possibly view wildlife or signs of wildlife in these areas is of significant interest and value to Plaintiffs' members and staff and increases the use and enjoyment of public lands and ecosystems in California. Plaintiffs' members also have an interest in the health and humane treatment of animals, and work to rehabilitate injured wildlife, including wildlife that may have been harmed by Wildlife Services' Wildlife Damage Management program. Plaintiffs' members, staff, and supporters have engaged in these activities in the past and intend to do so again soon.

12. Plaintiffs' members, staff, and supporters have a procedural interest in ensuring that Wildlife Services' Wildlife Damage Management program complies with all applicable federal statutes and regulations. Plaintiffs have worked to reform Wildlife Services throughout the United States, including in California, and would participate in the public processes NEPA requires for the Wildlife Damage Management program in the Sacramento District, specifically. Plaintiffs and their members, staff, and supporters have an interest in preventing Wildlife Services from using lethal and inhumane methods of wildlife damage management, particularly predator control, and in the use of more effective and proactive non-lethal alternatives that foster communities' coexistence with wildlife. The relief requested in this litigation would further that goal.

13. The interests of Plaintiffs' members, staff, and supporters have been, and will continue to be, injured by Wildlife Services' implementation of its Wildlife Damage Management program in California's Sacramento District and by Wildlife Services' failure to comply with NEPA.

14. The relief Plaintiffs seek in this complaint would redress the injuries of Plaintiffs' members, staff, and supporters. The relief Plaintiffs request, if granted, would prevent Wildlife Services from engaging in wildlife killing as part of its Wildlife Damage Management program unless and until it complies with federal law. Plaintiffs' requested relief, if granted, could have a long-term impact on reducing the amount of lethal predator control and other wildlife killing conducted in California, as well as the inhumane treatment of wildlife and other injuries. Plaintiffs' requested relief, if granted, would make wildlife killing more expensive for the California Department of Fish and Wildlife ("CDFW"), California Department of Food and Agriculture ("CDFA"), local municipalities, and private livestock producers because these entities would not be able to contract with Wildlife Services to kill wildlife on their behalf unless and until Wildlife Services complies with federal law. These entities could not and would not be able to completely replace Wildlife Services' Wildlife Damage Management program authorized through the 1997 EA/FONSI, and they would not be able to provide the services that the 1997 EA/FONSI authorized at the same cost as Wildlife Services. These entities do not have the equipment that Wildlife Services has, such as fixed-wing aircrafts for aerial gunning operations, or trained wildlife killing personnel.

15. Plaintiffs' interests, and the interests of their members and supporters, have been, are being, and will continue to be harmed by Wildlife Service's actions and inactions challenged in this complaint unless the Court grants the requested relief. The harm to Plaintiffs' interests, and to their members and supporters' interests, will be redressed if this Court issues the requested relief.

16. Defendant USDA APHIS WILDLIFE SERVICES is a division of the United States Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS"). Wildlife Services is a federal agency responsible for applying and implementing the

1  federal laws and regulations challenged in this complaint. Wildlife Services receives federal and
2  cooperator funding to undertake its Wildlife Damage Management program in California,
3  including in the Sacramento District.

4        17.     Defendant JANET BUCKNALL is being sued in her official capacity as the
5  Deputy Administrator of USDA APHIS Wildlife Services.

## LEGAL BACKGROUND

### I. National Environmental Policy Act

      18.     Under the National Environmental Policy Act ("NEPA"), a federal agency must prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). The human environment "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14.

      19.     To determine whether an action is significant—i.e., whether an EIS is necessary for the proposed action—the Council for Environmental Quality ("CEQ") regulations allow an agency to first prepare an Environmental Assessment ("EA"). *Id.* § 1501.4(b). CEQ regulations govern significance determinations, which require agencies to consider both the context of the action and the intensity of the environmental impacts. *Id.* § 1508.27. If the agency determines that a full EIS is not necessary, the agency prepares a Finding of No Significant Impact ("FONSI"). *Id.* § 1501.4(e). A FONSI is a "document . . . briefly presenting the reasons why [the proposed] action . . . will not have a significant effect on the human environment . . . ." *Id.* § 1508.13.

      20.     "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* § 1500.1(c). The CEQ "regulations provide the direction to achieve this purpose." *Id.* To that end, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

21. The environmental analysis must disclose and analyze the direct, indirect, and cumulative effects of the proposed action on the environment. *Id.* §§ 1502.16 (environmental consequences), 1508.7 (cumulative impacts), 1508.8 (direct and indirect effects), 1508.25(c)(3) (scope of impacts that must be considered).

22. An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. *Id.* § 1502.9(c)(1)(ii); *see Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937-38 (9th Cir. 2010).

## II. Administrative Procedure Act

23. Because NEPA does not contain an internal judicial review provision, the Administrative Procedure Act ("APA") governs judicial review. Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

24. In addition, APA section 706(1) authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTUAL BACKGROUND

## I. Wildlife Services' Wildlife Killing Program

25. Wildlife Services and its precursors have specialized in killing wildlife for more than 100 years and are responsible for the eradication of wildlife like wolves, bears, and other animals from much of the United States, particularly in the West. Wildlife Services contracts with other federal agencies, non-federal government agencies, and private landowners to fulfill its mission of "managing problems caused by wildlife."

26. At present, Wildlife Services kills more than one million native animals every year in the U.S. In fiscal year 2018, Wildlife Services reported that it intentionally killed 357 gray wolves, 68,186 adult coyotes (plus an unknown number of coyote pups in 361 destroyed dens), 515,915 red-winged blackbirds, 338 black bears, 375 mountain lions, 1,002 bobcats, 173

river otters (plus 537 killed "unintentionally"), 3,343 foxes (plus an unknown number of fox pups in 125 dens), and 22,521 beavers. The program also killed 17,739 prairie dogs outright, as well as an unknown number killed in more than 47,547 burrows that were destroyed or fumigated.

27. Each year Wildlife Services unintentionally kills thousands of non-target animals. These non-target animals include federally- or state-protected wildlife such as gray wolves, California condors, bobcats, and grizzly bears, as well as eagles, falcons, red-tailed hawks, great horned owls, porcupines, marmots, great blue herons, ruddy ducks, sandhill cranes, and ringtail cats. These killings undermine efforts to conserve and recover the affected species, which often need protection in part due to Wildlife Services' historic and ongoing practices.

28. Former employees of Wildlife Services have alleged that the agency underreports the numbers of animals it kills and, therefore, that the actual numbers of animals killed by Wildlife Services are likely greater than reported.

29. As explained below, many of the species that Wildlife Services targets play critical roles in ecosystems and their removals result in a cascade of unintended consequences. For example, the loss of top predators is known to have a wide range of often profound impacts on ecosystems, altering processes as diverse as the dynamics of disease, wildfire, carbon sequestration, invasive species, and biogeochemical cycles. In short, the removal of so many animals from the environment—especially predators—significantly alters native ecosystems directly, indirectly, and cumulatively.

30. Many of the methods Wildlife Services uses—including snares, leg-hold and body-gripping traps, and gas cartridges—are fundamentally nonselective, environmentally destructive, inherently inhumane, and often ineffective.

31. For example, leg-hold traps are internationally recognized as inhumane and have been banned in many countries. Upon being trapped, animals frantically struggle to free themselves both by attempting to pull their trapped limb out of the device and by chewing at the trap itself or even their own limb. The force of the jaws clamping on the animal's limb and the subsequent struggle can result in severe trauma, including mangling of the limb, fractures,

damage to muscles and tendons, lacerations, injury to the face and mouth, broken teeth, loss of circulation, frostbite, and amputation. Wildlife Services often fails to routinely check its traps, and as such, many animals experience prolonged suffering and eventually die of exposure.

32. In California's Sacramento District, the 1997 EA/FONSI authorizes Wildlife Services' to use leg-hold traps, cage traps, snares, Conibear traps, snap traps, mole and gopher traps, denning (using poisonous gas to kill animals in dens or excavating pups from dens and then shooting them), shooting, aerial gunning (shooting animals from airplanes or helicopters), hunting dogs, M-44s ("cyanide bombs"), livestock protection collars, and more.

33. Target species include the coyote, red fox, mountain lion, black bear, bobcat, gray fox, and dog. Wildlife Services has also unintentionally trapped and sometimes killed several non-target animals in California's Sacramento District, including badgers, gray foxes, jackrabbits, muskrats, opossums, porcupines, raccoons, and skunks.

34. At the time of the 1997 EA/FONSI, Wildlife Services' Sacramento District included ten California counties: Colusa, El Dorado, Lake, Marin, Napa, Placer, Sacramento, Solano, Sonoma, and Yolo.

II. **NEPA Analysis of Wildlife Damage Management in California's Sacramento District**

35. Wildlife Services has never prepared an EIS to analyze the impacts of its Wildlife Damage Management program in California's Sacramento District.

36. In 1994, Wildlife Services prepared (and, in 1997, amended) a Programmatic EIS ("1994 PEIS") to analyze its nationwide Wildlife Damage Management program. That outdated document relies primarily on science from the 1980s, with some studies dating as far back as the 1930s.

37. In 1997, Wildlife Services issued an EA and FONSI for Wildlife Damage Management in California's Sacramento District. The 1997 EA/FONSI explains that "[t]he analysis in this EA relies heavily on existing data contained in published documents, primarily the USDA-APHIS-ADC Environmental Impact Statement (ADC EIS) (USDA 1994) to which this environmental assessment (EA) is tiered."

38. On October 12, 2016, Wildlife Services announced that it intended to redo or revise all the NEPA documents currently tiered to the 1994 PEIS.

39. On February 15, 2019, Plaintiff Center for Biological Diversity sent Wildlife Services a letter providing new scientific and other information relevant to the Wildlife Damage Management program in California's Sacramento District. The letter requested that Wildlife Services supplement its outdated EA or begin preparation of an EIS given the potential for significant impacts.

40. In a letter dated March 7, 2019, the California State Director of Wildlife Services, Dennis Orthmeyer, stated that Wildlife Services is preparing a statewide EIS under a settlement agreement with Plaintiffs and others. However, that settlement agreement governs Wildlife Services' actions in California's North District, not its actions in the Sacramento District. *Center for Biological Diversity v. USDA APHIS WILDLIFE SERVICES*, No. 3:17-cv-3564-WHA (N.D. Cal.).

41. As of the date of this complaint, Wildlife Services has not supplemented its analysis in the 1997 EA/FONSI.

### III. New Information and Circumstances Affecting Wildlife Damage Management in California's Sacramento District

42. Since Wildlife Services prepared its 1997 EA/FONSI, new information and circumstances necessitate supplemental NEPA analysis.

43. The number of animals that Wildlife Services kills annually has sharply increased since preparation of the 1997 EA/FONSI. In the 1997 EA/FONSI, Wildlife Services stated that across the entire Sacramento District, the Wildlife Damage Management program killed an annual average of 916 coyotes, 16 bobcats, 26 gray foxes, seven red foxes, 11 mountain lions, and seven black bears. Some individual counties now nearly exceed those outdated annual districtwide averages. For example, Wildlife Services in El Dorado County alone killed 238 coyotes, 29 mountain lions, 456 raccoons, 759 skunks, and 20 black bears over a two-year period (2015-2017).

44.     Additionally, the species that Wildlife Services targets in the Sacramento District have changed. The 1997 EA only considered impacts on predators, including coyotes, black bears, mountain lions, bobcats, and foxes. Wildlife Services now kills dozens of other kinds of animals each year as part of its Wildlife Damage Management program. For example, in 2018, Wildlife Services in California killed 859 beavers, 1,266 blackbirds, 2,764 skunks, and 7,713 squirrels.

45.     The methods Wildlife Services uses also have changed since 1997. For example, the 1997 EA/FONSI authorizes use of livestock protection collars and M-44s, which Wildlife Services no longer uses in California.

46.     Since the 1997 EA/FONSI, additional species that live in California's Sacramento District have been listed as threatened or endangered under the federal and/or California Endangered Species Act and additional critical habitat has been designated there. These species include the California tiger salamander (Sonoma County "distinct population segment" federally listed as endangered in 2002 and revised critical habitat designated in 2001; Central "distinct population segment" federally listed as threatened in 2004 and critical habitat designated in 2005), Sierra Nevada yellow-legged frog (federally listed as endangered in 2014 and critical habitat designated in 2016), wolverine (proposed as federally threatened in 2016), tidewater goby (critical habitat designation revised in 2013), riparian brush rabbit (federally listed as endangered in 2000), gray wolf (state listed as endangered in 2017), tricolored blackbird (state listed as endangered in 2018), and foothill yellow-legged frog (identified as state candidate in 2017).

47.     The Wildlife Damage Management program may affect these animals, but none of these listings or designations were analyzed in the 1997 EA/FONSI. As one specific example, the endangered gray wolf returned to California in 2015, but the 1997 EA/FONSI did not analyze impacts on gray wolf and includes no mitigation measures to prevent harm to the species.

48.     In addition, numerous "evolutionarily significant units" of salmon have been listed or had critical habitat designated in the District, including the Central California Coast Coho (federally endangered listing revised in 2012), California Coastal Chinook and Central Valley Spring-run Chinook (both federally listed as threatened in 1999 and critical habitat

designated in 2005), Central Valley steelhead, Northern California steelhead, and Central California Coast steelhead (federally listed as threatened in 2006 and critical habitat designated in 2005). Salmon can be harmed by Wildlife Services' killing of beavers, which create ideal salmon habitat.

49. Since 1997, the Environmental Protection Agency ("EPA") has issued new restrictions to protect threatened and endangered species, such as gray wolves, that could be harmed by Wildlife Services' use of gas cartridges to kill denning animals.

50. Since the issuance of the 1997 EA/FONSI, numerous studies have been published that demonstrate the harmful ecological effects of removing predators from ecosystems (*e.g.*, Beschta & Ripple 2009, 2016; Levi et al. 2012; Bergstrom et al. 2013; Bergstrom 2017).

51. Numerous studies published after the 1997 EA/FONSI call into question Wildlife Services' assumption that killing predators effectively protects commercial livestock in the long term. For example, Wielgus and Peebles (2014) found that killing predators to protect livestock can backfire and may actually *increase* livestock depredation. In addition, Treves and others (2016) found little or no scientific support for the proposition that killing predators such as wolves, mountain lions, and bears reduces livestock losses (*see also* van Eeden et al. 2018).

52. In addition, new information regarding the cost-effectiveness of predator control has emerged since the 1990s. For example, Rashford and Grant (2010) published a literature review of economic analyses of predator control.

53. New information raising ethical concerns about the practices of some Wildlife Services staff has also emerged since 1997. For example, in 2012, The Sacramento Bee published a series of articles exposing several practices of Wildlife Services. This series described ethical problems within the agency, including employees hiding the killings of non-target animals. The Sacramento Bee reported that a Wildlife Services employee posted photographs online of his dogs attacking coyotes caught in leg-hold traps and was not disciplined.

54. Since 1997, a variety of nonlethal, alternative methods have been successfully used to prevent wildlife conflicts. Numerous studies have demonstrated the effectiveness of such

nonlethal methods to protect livestock from predators (*e.g.*, Shivik et al. 2003; Lance et al. 2010).

55. Marin County, California, provides a strong illustration of the advantages and effectiveness associated with nonlethal predator control. In 2000, Marin County redirected funds from lethal management toward nonlethal measures. Funds were allocated for the provision of tools such as livestock guard animals (dogs and llamas), night corrals, fencing, lamb sheds, noise- and light-generating devices, and compensation to farmers for livestock losses. These measures proved less expensive and more effective than lethal control; average annual losses declined from five percent to just over two percent. Marin County's experience demonstrates that nonlethal wildlife management tools are both effective and affordable, and the proven feasibility of nonlethal methods requires supplemental NEPA analysis.

56. California law has also changed since the 1997 EA/FONSI. California law now prohibits bobcat trapping, 14 C.C.R. § 478(c) ("It shall be unlawful to trap any bobcat, or attempt to do so, or to sell or export any bobcat or part of any bobcat taken in the State of California."), as well as the poisoning, snaring, and trapping of mountain lions, 14 C.C.R. § 402(b) (". . . no mountain lion shall be taken by means of poison, leg-hold or metal-jawed traps and snares."). Moreover, Proposition 4, passed in 1998, bans the following methods of capturing or killing wildlife: body-gripping traps, such as leg-hold traps; conibear traps and snares for commercial and recreational purposes; leg-hold traps for all purposes (except by authorized agencies to protect public human health and safety); Compound 1080; and sodium cyanide (in M-44s).

57. The environmental baseline for the Sacramento District is now different because Wildlife Services no longer operates in Marin County, California, as it did in 1997.

58. More than 20 years have passed since preparation of the 1997 EA/FONSI and 1994 PEIS. For all the reasons explained above, those analyses are now outdated and can no longer be reasonably relied upon without supplemental NEPA analysis.

//
//
//

## CLAIM FOR RELIEF

**NEPA and APA Violation: Failure to Supplement 1997 EA/FONSI**

1. Plaintiffs re-allege and incorporate by reference the preceding paragraphs into the claim set forth below.

2. NEPA requires an action agency to prepare an EIS when a proposed major federal action may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(c)(1)(ii).

3. Wildlife Services' Wildlife Damage Management program in the Sacramento District is an ongoing major federal action that may significantly affect the quality of the environment.

4. Here, more than two decades have passed since Wildlife Services completed its 1994 PEIS and its 1997 EA/FONSI. Those analyses are now outdated and can no longer be reasonably relied upon without supplemental analysis.

5. Indeed, significant new circumstances and information that are relevant to environmental concerns, and that have bearing on Wildlife Services' activities in the Sacramento District, have since emerged. For example, recent studies demonstrate the harmful effects of removing predators from ecosystems and additional animals have been protected under the Endangered Species Act, 16 U.S.C. §§ 1531-1544, that require analysis.

6. Wildlife Services' failure to supplement its NEPA analysis is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action unlawfully withheld or unreasonably delayed under Section 706 of the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests. 5 U.S.C. § 706.

//

//

//

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court:

(1)     Declare that Wildlife Services has violated and is violating NEPA, 42 U.S.C. §§ 4321-4347, and CEQ's implementing regulations, 40 C.F.R. §§ 1500-1508, by failing to supplement its outdated NEPA analysis governing its Wildlife Damage Management program in California's Sacramento District;

(2)     Declare that Wildlife Services' failure to supplement its outdated NEPA analysis and its failure to halt or limit its ongoing wildlife killing while completing the new analysis is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action unlawfully withheld or unreasonably delayed under Section 706 of the APA, 5 U.S.C. § 706;

(3)     Order Wildlife Services to complete the required supplemental NEPA analysis by a reasonable date certain;

(4)     Enjoin Wildlife Services and its agents from proceeding with implementing the challenged Wildlife Damage Management program unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

(5)     Award Plaintiffs' their attorneys' fees and costs in this action pursuant to 28 U.S.C. § 2412; and

(6)     Grant such other and further relief as the Court deems just and proper.

Respectfully submitted and dated this 27th day of August, 2019.

/s/ *Cristina R. Stella*
Cristina R. Stella (CA Bar No. 305475)
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931-4091
Phone: (707) 795-2533 ext. 1055
cstella@aldf.org

Collette L. Adkins (MN Bar No. 035059X)*
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Phone: (651) 955-3821
cadkins@biologicaldiversity.org

*Attorneys for Plaintiffs*

*Seeking admission *pro hac vice*